USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/21/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
SUSAN CALVO, JOHN PETERS
PROFESSIONAL LIMOUSINES, INC.,
JACKLYN RESTREPO, PEDRO CAMACHO,
EAMON YUEL and YONG ZHANG individually
and on behalf of all others similarly situated,

         Plaintiffs,

    -against-

CITY OF NEW YORK, MEERA JOSHI, DAVID
YASSKY, and RAYMOND SCANLON,

         Defendants.
------------------------------------------------------------- X

14-CV-7246 (VEC)

OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

  This case involves the former policy and practice of the Defendant City of New York ("City") to seize vehicles that were being used illegally as vehicles for hire without a warrant and prior to a hearing. Holding in hand this Court's decision that the City's policy was unconstitutional as applied to so-called first time violators, Plaintiffs now seek class certification. For the following reasons, Plaintiffs' motion for class certification is DENIED without prejudice.

## BACKGROUND

  The Court assumes the parties' familiarity with the facts of this case and directs readers to its prior opinion. *See Harrell v. City of N.Y.* ("*Harrell I*"), 138 F. Supp. 3d 479 (S.D.N.Y. 2015). For the purposes of this opinion, the following facts merit repetition.

  Prior to this Court's summary judgment decision, when a police officer or Taxi and Limousine Commission ("TLC") inspector had probable cause to believe that a vehicle was being operated as an unlicensed vehicle for hire in violation of N.Y. City Administrative Code ("Code") § 19-506(b)(1), the officer or inspector was authorized to seize the vehicle prior to an

1

administrative hearing on the alleged violation. *Harrell I*, 138 F. Supp. 3d at 485 (citing Code § 19-506(h)(1); 35 R.C.N.Y. §§ 68-23(b)(2), (c)(2)). The TLC would issue a summons for the alleged violation to the operator and the registered owner, if different from the operator, of the vehicle that was seized. Murray Decl. ¶ 4.[1] The seized vehicle was not released until the administrative hearing, unless the owner or operator either (1) pleaded guilty to the Section 19-506(b)(1) violation and paid a fine or (2) posted a bond. *Harrell I*, 138 F. Supp. 3d at 485 (citing Code § 19-506(h)(1); 35 R.C.N.Y. § 68-23(d)(2)). In addition, the TLC required payment of the seized vehicle's towing and storage fees before it would release the vehicle; if the Section 19-506(b)(1) violation was ultimately dismissed, those fees would be returned. *See* SJ Mem. 4; *see also* SJ Oral Arg. Tr. 10:9–12 ("There is no question that they all had to pay a towing and storage charge, which they get back if the case is dismissed, but everyone has to pay that to get their car back. I don't think there is any dispute about that.").

The Court concluded that this policy was unconstitutional under the Fourth and Fourteenth Amendments as applied to vehicle owners with no prior violations in the preceding 36 months ("first-time violators"), and granted Plaintiffs' cross-motion for summary judgment as to liability relative to first-time violators. *Harrell I*, 138 F. Supp. 3d at 496.[2] Upon reconsideration, the Court reaffirmed its grant of summary judgment as to liability relative to Plaintiffs Michael Harrell, Jaclyn Restrepo, and Peter Camacho, but denied Plaintiffs' cross-

---

[1] The Court uses the following abbreviations herein: Declaration of Edward Murray in Opposition to Plaintiffs' Motion for Class Certification (Dkt. 197) is "Murray Decl."; Declaration of Karen B. Selvin in Opposition to Plaintiffs' Motion for Class Certification (Dkt. 187) is "Selvin Decl."; Defendants' opening brief in support of its motion for summary judgment (Dkt. 32) is "SJ Mem."; Plaintiffs' opening brief in support of their motion for class certification (Dkt. 166) is "Mem."; Plaintiffs' reply brief in further support of motion for class certification (Dkt. 194) is "Reply"; the transcript of oral argument on Defendants' motion for summary judgment (Dkt. 55) is "SJ Oral Arg. Tr."; and the transcript of oral argument on Plaintiffs' motion for class certification is "Tr."

[2] The City represents, and Plaintiffs do not dispute, that it ceased seizing first-time violators' vehicles after this Court's summary judgment decision. *See* Dkt. 59.

motion for summary judgment as to liability relative to Plaintiffs Susan Calvo and John Peters Professional Limousines ("JPPL"). *Harrell v. City of N.Y.* ("*Harrell II*"), No. 14-CV-7246 (VEC), 2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015). In so holding, the Court found that there were questions of fact whether Plaintiffs Calvo and JPPL were actually first-time violators at the time of their complained-of seizures. *Harrell II*, 2015 WL 9275683, at *4.

The Court then granted Plaintiffs leave to amend their complaint to add new plaintiffs. Dkt. 80. Plaintiffs filed a Second Amended Complaint, adding Eamon Yuel and Yong Zhang as new plaintiffs. Dkt. 101. The parties completed fact discovery, including discovery relevant to class certification. After receiving from the City spreadsheets listing all putative class members ("Class Lists"), the parties were permitted to conduct discovery into one of every five of those putative class members.

Plaintiffs have moved for class certification. Dkt. 165. Defendants oppose Plaintiffs' motion on a variety of grounds, including that the proposed class is not ascertainable, that members of the putative class lack Article III standing, and that the proposed class fails to meet the requirements of Rule 23 of the Federal Rules of Civil Procedure. For the following reasons, the Court denies Plaintiffs' motion without prejudice.

## DISCUSSION

Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "The filing of suit as a class action does not relax this jurisdictional requirement." *Id*. To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Because these Article III requirements are "an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *see also In re Elec. Books Antitrust Litig.*, Nos. 11 MD 2293 (DLC), 12 Civ. 3394 (DLC), 2014 WL 1641699, at *8 (S.D.N.Y. Apr. 24, 2014) (citing *Lewis*, 518 U.S. at 358). Accordingly, Plaintiff's burden to show Article III standing becomes higher as the case proceeds:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Lewis*, 518 U.S. at 358 (quoting *Lujan*, 504 U.S. at 561). Here, at class certification, Plaintiffs must prove standing by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements").

In connection with class certification, "[t]he class must [] be defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d at 264. Although it is not necessary that each member of the putative class submit evidence of personal standing, "no class may be certified that contains members lacking Article III standing." *Id.* at 263–64. Put differently,

4

"Article III's jurisdictional requirements [apply] to each member of a class." *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 126 (2d Cir. 2007) (citing *Denney*), *rev'd on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Ultimately, the Article III standing inquiry must be examined through the prism of the class definition, and, in this Circuit, a class cannot be certified if any person captured within that definition lacks Article III standing. *See Denney*, 443 F.3d at 263–64.[3]

Plaintiffs' class definition is like a magical shape-shifter; it changed form multiple times within Plaintiffs' own brief and even during oral argument. In their opening brief, Plaintiffs used various class definitions: they first proposed a class of "all 'straight plate' vehicle *owners* whose vehicles were seized . . . ," Mem. 1 (emphasis added); two pages later, the class definition morphed into "all *owners and operators* of 'straight plate' vehicles seized . . . ," Mem. 3 (emphasis added);[4] the definition later became "all *persons* who . . . had *their* vehicle seized," Mem. 8 (emphases added). In their reply brief, Plaintiffs stated that their definition encompassed "all *persons* who . . . had *their* vehicle seized," Reply 2 (emphases added), but that definition was offered under a section title stating "[t]he class comprises *owners*," Reply 2 (emphasis added), and Plaintiffs argued on the following page that they had standing because "everyone on the Class Lists is a *registered owner* of a seized vehicle," Reply 3 (emphasis added). At oral argument, Plaintiffs represented that they were abandoning a class definition that included the operators of the vehicles that were seized and that their desired class definition encompassed "only the registered owners." Tr. 4:12–19. But as oral argument continued, Plaintiffs proposed

---

[3] Although other courts of appeals have adopted a test that "hinges exclusively on the Article III standing of the 'named plaintiffs' or 'class representatives'" and "ignore[s] the absent class members entirely," *In re Deepwater Horizon*, 739 F.3d 790, 800 (5th Cir. 2014) (discussing different circuit approaches to Article III standing inquiry at class certification), *Denney* quite clearly requires all class members to have standing.

[4] A "straight plate" vehicle is a vehicle that is not registered as a "for hire" vehicle. *Harrell I*, 138 F. Supp. 3d at 485 n.3.

yet another class definition: "not only the people who were the registered owners but the people who were treated as the owners of the vehicles by the defendants in the course of the seizure program." Tr. 13:23–14:2.

The problem with Plaintiffs' class definition(s) is not just volatility—although that aspect is troublesome. All of Plaintiffs' proposed definitions identify the class according to the registered owners (or whom the City treated as the registered owners) of the vehicles that were seized. Defendants contend that, under the facts of this case, the mere fact that an individual is a registered owner of a vehicle is not sufficient for Article III standing to challenge that vehicle's seizure. The Court agrees.

The Second Circuit has made clear that in assessing Article III standing, "while ownership and possession generally may provide evidence of standing, it is the *injury* to the party seeking standing that remains the ultimate focus." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (emphasis added). Because of "the lack of proven injury," the Second Circuit has "denied standing to 'straw' owners who do indeed 'own' the property, but hold title to it for somebody else. Such owners do not themselves suffer an injury when the property is taken." *Id.* (citing *United States v. 500 Delaware Street*, 113 F.3d 310, 312 (2d Cir. 1997). For example, "[a]n airline passenger . . . who does not know that a bag seized from him contains money does not have standing to challenge a forfeiture of the funds because he has suffered no injury." *Id.* at 528. Thus, to demonstrate injury in fact sufficient for Article III standing, "one must be more than a mere 'straw owner[]' who holds title for some unknown person." *United States v. $829,422.42, Currency*, 561 F. App'x 100, 100 (2d Cir. 2014). Rather, "[t]here must be some indicia of reliability or substance to claims of ownership in order to reduce the likelihood of a false or frivolous claim." *Id.* (citation and internal marks omitted).

Defendants have adduced compelling evidence that certain registered owners (who are captured under all of Plaintiffs' proposed class definitions) are in fact "straw" owners who lack a true ownership interest in the vehicles that were seized. For example, Defendants have adduced evidence showing that a number of vehicles were registered and titled in Michael Harrell's name in Pennsylvania, but that Harrell was living with his mother in New York when the vehicles were registered and lacked the financial resources to acquire those vehicles.[5] *See* Selvin Decl., ¶¶ 5–6, Exs. B–C. Defendants also have adduced evidence showing "hundreds of examples where a vehicle registered to a putative class member was also registered under someone else's name for a separate seizure." Murray Decl. ¶ 38. In one example, a putative class member was the registered owner of multiple vehicles, but was not driving any of the vehicles at the time the vehicle was seized and did not recover any of the vehicles from the TLC; certain of his vehicles had previously been (or subsequently were) registered in the names of at least six other putative class members. Murray Decl. ¶ 40.[6] Defendants thus have adduced evidence drawing into question whether certain individuals on Plaintiffs' Class Lists have a true or legitimate ownership interest in the vehicle that was seized by the City. Plaintiffs have offered no evidence to rebut the City's evidence that many individuals on the Class Lists are straw owners.

Citing *Cambio Exacto*, Plaintiffs contend that "every member of the proposed class has standing, even if a handful of class members ultimately prove to be 'straw owners' of their

---

[5] Harrell was formerly a named plaintiff in this case, but the Court vacated judgment in his favor and dismissed Harrell from the action because he failed on multiple occasions to appear for his deposition. Dkt. 160. Harrell remains, however, a putative class member in this case.

[6] Additional evidence that certain putative class members are straw owners include the fact that some of the registered owners live out of state (and as far away as Texas) and yet have had multiple vehicles seized under Section 19-506(b)(1) and the fact that multiple vehicles are registered to multiple people at single locations far from New York City. *See* Murray Decl. ¶¶ 23–41. Many of these individuals were neither driving the vehicle when it was seized nor did they claim the vehicle from the TLC following the seizure. *See, e.g.*, Murray Decl. ¶¶ 24, 29–30, 33, 40.

vehicles, because they incurred liability to Defendants in the form of fines, as well as towing and storage fees." Dkt. 219 at 1. But *Cambio Exacto* does not support Plaintiffs' argument for standing. In *Cambio Exacto*, the plaintiffs were money transmitters that held customer accounts from which funds were seized.[7] *Cambio Exacto*, 166 F.3d at 524–25. Without deciding whether the plaintiffs had an actual ownership interest in the funds that were seized from the plaintiffs' accounts, the Second Circuit concluded that the plaintiffs had Article III standing "because they had a liability to their customers in an amount equal to the forfeited funds" that exposed them to economic injury. *Id*. at 528. *Cambio Exacto* was decided at the motion to dismiss stage, requiring the plaintiffs only to allege plausibly that they had standing, *id*. at 524, and the Second Circuit's conclusion was based on its express finding that the plaintiffs were, in fact, liable to their customers for the funds that were seized, *id*. at 528.

Plaintiffs do not appear to dispute that their proposed class may include registered owners who were "straw" owners of the vehicles seized, instead shrugging off Defendants' evidence as reflective of "a relatively small percentage of the seizures." Tr. 25:3–4. But under *Denney*, "no class may be certified that contains members lacking Article III standing." *Denney*, 443 F.3d at 264. And despite Defendants' compelling evidence that Plaintiffs' proposed class (under all of Plaintiffs' proposed class definitions) includes "straw" owners, Plaintiffs have failed to adduce *any* evidence tending to show that these proposed class members suffered any injury at all as a result of the seizures.

At oral argument, Plaintiffs argued that "straw" owners suffered an injury in fact from the vehicle seizures because: (a) they were legally responsible for the towing and storage fees incurred in connection with the seizure of the vehicles, Tr. 46:23–47:5; (b) they were legally

---

[7] "Money transmitters" are "in the business of sending money: collecting it from customers and, for a commission, delivering it to a designated recipient, typically in another country." *Cambio Exacto*, 166 F.3d at 524.

responsible for the fines imposed for violating Section 19-506(b)(1), Tr. 15:2–9; and (c) each registered owner had to authorize a representative to do so if he or she did not appear to reclaim the vehicle from the TLC, Tr. 14:21–15:2, 17:7–12, 51:14–16. None of these arguments is persuasive.

Plaintiffs argue that the registered owner was responsible for towing and storage fees, Tr. 46:23–47:5, but Plaintiffs have not adduced evidence tending to show that the City actually pursued the registered owners for those fees. Tr. 47:6–8 (Q: "Is there any evidence that the City pursues towing fees if the car is abandoned?" A: "Not to my knowledge, your Honor, no.").[8] Defendants' subsequent written representation that "the City has never filed any liens relating to towing and storage fees" associated with the seizures, Dkt. 220 at 2 n.3, is consistent with Plaintiffs' lack of evidence that the City actually pursued the registered owners for those fees in connection with abandoned vehicles. And, for a vehicle registered in the name of a "straw" owner but retrieved by the vehicle's operator or someone else, Plaintiffs have failed to adduce any evidence showing that the straw owner, in fact, actually paid the towing and storage fees.

Plaintiffs further contend that "straw" owners suffered an injury because they were liable for fines assessed by the TLC in connection with the Section 19-506(b)(1) violation. That may be so, but it is irrelevant to this case. This Court has held that the City's practice of seizing vehicles, suspected of violating Section 19-506(b)(1) and as applied to first-time violators, was unconstitutional. *See Harrell I*, 138 F. Supp. 3d 479. The Court made no finding relative to the constitutionality of Section 19-506(b)(1), the statute that imposes fines on owners and, if different, operators of vehicles that are illegally used for hire. Put differently, the City's seizure

---

[8] If the vehicle was claimed from the TLC, the individual claiming the vehicle was required to pay those fees before the vehicle would be released. SJ Oral Arg. Tr. 10:9-12. Thus, the liability on which Plaintiffs rely exists, even theoretically, only for individuals who abandoned the vehicle after seizure.

of the vehicles is an entirely separate issue from the City's prosecution of the Section 19-506(b)(1) violation; this case and the Court's summary judgment decision concerned the former, not the latter. Indeed, Plaintiffs' suggestion that the registered owners were injured because they had to pay fines associated with the summons ignores this Court's order denying Plaintiffs' request for class discovery related to payment of Section 19-506 fines.[9] Dkt. 120. In any event, Plaintiffs also have adduced no evidence that the straw purchasers paid the fines (which also was required before the vehicles would be released from the TLC),[10] or that, as to abandoned vehicles, the City pursued registered owners for the fines. Tr. 15:12–14 (Q: "Do you have any evidence that for the abandoned cars the City pursues the registered owners?" A: "No, your Honor, I don't . . . .").

Relatedly, Plaintiffs also suggest that "straw" owners suffered an injury in fact because, in response to the summons for the Section 19-506(b)(1) violation, those owners authorized representatives "to act as agents of the registered owner to pay the fines." Tr. 16:22–25. But a

---

[9] At the discovery stage, Plaintiffs failed to articulate why they were entitled class discovery of the fines. Plaintiffs' request for discovery of the Section 19-506 fines "rest[ed] on their contention that the process of seizing vehicles was inherently coercive for *all* owners–ones who were innocent of the violation as well as those who were guilty of the violation." Dkt. 120 at 3. The Court was not persuaded by Plaintiffs' theory and denied their request for class discovery relative to fines paid. Dkt. 120.

Here, Plaintiffs wrap their theory on the fines in a different package: Plaintiffs argue that the Section 19-506 fines are evidence of owners' injuries in fact because the owners were liable for those fines. During discovery, the Court was not persuaded that the fines were evidence of damages incurred as a result of the City's policy of seizing vehicles, *see id.,* and the Court remains unpersuaded.

[10] At oral argument, Plaintiffs suggested that the fine was paid by the registered owner because the registered owner, if he or she did not appear before the TLC, authorized a representative to pay the fine on his behalf. Tr. 16:20–25. Plaintiffs noted, however, that it was "an impossible proof" to "sourc[e] the cash, which was almost always what was used to pay the fine" because counsel could not "wind back the clock and trace the funds that went into pay[ing] these fines." Tr. 16:25–17:3. The Court rejects Plaintiffs' theory that the owner authorization resulted in an injury in fact for the reasons discussed *infra*. The Court also rejects Plaintiffs' contention that it is impossible to source the money used to pay the fine: an owner's sworn testimony, for example, would have been evidence that the owner him- or herself paid the fine. Plaintiffs apparently made a strategic decision not to gather such evidence from members of the putative class, despite being on notice that Defendants were going to argue that there were straw purchasers in the putative class. That was Plaintiffs' choice to make, but failing to do necessary legwork so that a fact can be proven does not transmute the fact into something that is impossible to prove.

"straw" owner—one who does not have a true ownership interest in the vehicle but merely has the vehicle registered in his or her name—is not *injured* by signing an authorization for someone else to retrieve the vehicle from the TLC. Signing an authorization has no impact on such an owner because he or she has no true ownership interest in the vehicle that was seized; there is no evidence that such an owner cared at all or experienced any harm (emotional or financial) in connection with the vehicle being seized.

None of the cases that Plaintiffs cite in their letters to the Court supports their claim that all of their putative class members have Article III standing. In *United States v. Any and All Funds on Deposit in Account No. 12671905, Held in the Name of Landlocked Shipping Company at Wells Fargo Brokerage Services*, the district court noted that mere "straw" owners of funds would not have standing to challenge the forfeiture of those funds, but found that the claimants had adduced sufficient evidence that they had suffered injury in fact; for example, the claimants had purchased and sold, or paid taxes on and rented, the property that was the source of the funds sought to be forfeited. *See Account No. 12671905*, No. 09 CV 3481 (HB), 2010 WL 3185688, at *6 (S.D.N.Y. Aug. 10, 2010). And in *United States v. Any and All Funds on Deposit in Account Number XXXXX-XXXXXXXX at HSBC Bank PLC*, the district court also noted that mere possession of legal title was insufficient to establish Article III standing, but found (on a motion to dismiss) that the plaintiff had alleged an injury in fact because the plaintiff's "personal use of the funds [was] a sufficient indicia of her control over the property to dispute that she is merely a nominal owner." 87 F. Supp. 3d 163, 167 (D.D.C. 2015).

Plaintiffs contend that under *Denney*, "even a remote possibility of future economic harm is sufficient to confer Article III standing on the person threatened by such harm." Dkt. 221 at 1 (citing *Denney*, 443 F.3d at 265 (quoting 7AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER &

MARY KAY KANE, FED. PRAC. & PROC. § 1785.1 (3rd ed. 2005) ("If plaintiff can show that there is a possibility that defendant's conduct may have a future effect, even if injury has not yet occurred, the court may hold that standing has been satisfied."))). Plaintiffs quote *Denney* out of context. The Second Circuit's discussion of future economic harm was in the context of describing class members who had not been audited for faulty tax strategies but were at risk of being audited by the IRS in the future. *Denney*, 443 F.3d at 264–65. The Second Circuit held that the *Denney* class members had suffered injuries in fact because they "by definition[,] received allegedly negligent or fraudulent tax advice, and took some action in reliance on that advice." *Id.* at 265. They, for example, had "taken costly and time-consuming steps to rectify errors in their past or future tax filings, and paid fees for the advice." *Id.* at 265. In addition, *Denney* considered the Article III standing question in the context of a class settlement that was at the pleading stage; at that stage, the *Denney* plaintiffs needed only to allege plausibly that they had suffered an injury in fact. *See id.* at 263.

Although it is "not require[d] that each member of a class submit evidence of personal standing[,] [a]t the same time, no class may be certified that contains members lacking Article III standing." *Denney*, 443 F.3d at 264 (citations omitted). Defendants have adduced compelling evidence that the putative class includes individuals who were the registered owners of vehicles that were seized, but who lacked a true ownership interest in the vehicle because they held bare legal title. Although they were confronted with evidence of putative class members *sans* Article III standing, Plaintiffs have adduced no evidence that any of these individuals actually suffered an injury in fact by virtue of the City's seizure of the vehicle. It is Plaintiffs' burden to show that the class they seek to certify satisfies Article III's jurisdictional requirements, *see Denney*, 443 F.3d at 263–65; *see also Lewis*, 518 U.S. at 358, but Plaintiffs have adduced *no* evidence

showing that the subset of their proposed class consisting of "straw" owners suffered an injury in fact.

The Court concludes that Plaintiffs have failed to propose a class that is defined in such a way that everyone within it has standing. *See Denney*, 443 F.3d at 264. Under all of their proposed definitions, Plaintiffs seek to include all registered owners of vehicles that were seized by the City; Plaintiffs have failed to rebut the City's compelling evidence that a subset of that class consists of "straw" owners who did not suffer any injury in fact from the City's unconstitutional practice of seizing vehicles suspected of being used in violation of Section 19-506(b)(1) from first time violators. A registered owner might have suffered an injury in fact if he or she was operating the vehicle at the time that it was seized or if he or she retrieved the vehicle from the TLC after it was seized. But given the City's evidence of straw owners, Plaintiffs cannot simply rely on the fact that the vehicle was registered in a person's name to demonstrate that the person suffered an injury from the vehicle's seizure. *See id.*; *see also $829,422.42, Currency*, 561 F. App'x at 100.[11]

Although courts have discretion to modify the definition of the putative class, *see Sanchez v. N.Y. Kimchi Catering, Corp.,* No. 16 CIV. 7784 (LGS), 2017 WL 2799863, at *5 (S.D.N.Y. June 28, 2017), this Court declines to do so. Instead, the Court grants Plaintiffs' request to move to certify a more narrow class. A class consisting of registered owners who

---

[11] At oral argument, Plaintiffs attempted to side-step *Denney* by arguing that they had class standing under *NECA-IBEW Health & Welfare Fund v. Goldman Sachs Co.*, 693 F.3d 145 (2d Cir. 2012). Tr. 48:1–49:9. But class standing is different from Article III standing, and "whether [Plaintiff] has 'class standing'—that is, standing to assert claims *on behalf of* [the class members] does not turn on whether [Plaintiff] would have . . . Article III standing . . . ." *NECA-IBEW*, 693 F.3d at 158. Plaintiffs also argued that whether individual class members were "straw" owners was an issue "capable of determination in a[n] administrative proceeding at a later stage in this case . . . on a case-by-case basis" and was "not the kind of question that so infects this body of cases as to prevent class certification." Tr. 35:23–36:4. Article III justiciability, however, is a threshold question, and this Circuit has made clear that "Article III's jurisdictional requirements [apply] to each member of a class." *In re Literary Works*, 509 F.3d at 126.

were either operating the vehicles at the time that they were seized or who retrieved the vehicles from the TLC might be sufficient to narrow the class to those who have Article III standing. It is unclear, however, whether a narrower class would satisfy Rule 23(a)'s numerosity requirement. In all events, the Court makes no finding relative to whether a class can be defined that would satisfy Article III and Rule 23, whether any of the named Plaintiffs would be a suitable class representative, nor whether Plaintiffs' counsel is qualified to be named as class counsel. Because Plaintiffs' proposed class definition(s) include(s) members that lack Article III standing, the Court denies without prejudice Plaintiffs' motion for class certification.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion is DENIED without prejudice. If Plaintiffs would like to move again for class certification, they must file their motion on or before **November 1, 2017**. Defendants must file their opposition brief on or before **December 1, 2017**. Plaintiffs may file a reply brief on or before **December 20, 2017**. The Clerk of Court is respectfully directed to terminate Docket Entry No. 165.[12]

**SO ORDERED.**

Date: **September 21, 2017**
New York, New York

_____
**VALERIE CAPRONI**
**United States District Judge**

---

[12] If the parties would like a referral to Magistrate Judge Freeman for a settlement conference in lieu of briefing a revised motion for class certification at this time, they must seek a joint referral to Magistrate Judge Freeman before **October 20, 2017**.

14