USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/2/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
SUSAN CALVO, JOHN PETERS  
PROFESSIONAL LIMOUSINES, INC.,  
JACKLYN RESTREPO, PEDRO CAMACHO,  
EAMON YUEL and YONG ZHANG individually  
and on behalf of all others similarly situated,  

        Plaintiffs,

-against-

CITY OF NEW YORK, MEERA JOSHI, DAVID
YASSKY, and RAYMOND SCANLON,

        Defendants.
-------------------------------------------------------------- X

14-CV-7246 (VEC)

OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

This case involves the former policy and practice of Defendant City of New York ("City") to seize vehicles that were suspected of being used illegally as vehicles for hire without a warrant and prior to a hearing. After this Court decided that the City's practice was unconstitutional as applied to so-called first time violators, Plaintiffs sought class certification, which was denied without prejudice because Plaintiffs failed to propose a class defined in such a way that everyone within it had standing. Plaintiffs now seek class certification for a second time, but fail again, albeit for a different reason. For the following reasons, Plaintiffs' motion for class certification is DENIED with prejudice.

**I. BACKGROUND**

The Court assumes the parties' familiarity with the facts of this case and directs readers to its prior opinions. *See Harrell v. City of N.Y.* ("*Harrell I*"), 138 F. Supp. 3d 479 (S.D.N.Y. 2015); *Calvo v. City of New York* ("*Calvo I*"), No. 14-CV-7246 (VEC), 2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017). For the purposes of this opinion, the following facts merit repetition.

1

Prior to this Court's summary judgment decision, when a police officer or Taxi and Limousine Commission ("TLC") inspector had probable cause to believe that a vehicle was being operated as an unlicensed vehicle for hire in violation of N.Y. City Administrative Code ("Code") § 19-506(b)(1), the officer or inspector seized the vehicle prior to an administrative hearing on the alleged violation. *Harrell I*, 138 F. Supp. 3d at 484–85 (citing Code § 19-506(h)(1); 35 R.C.N.Y. §§ 68-23(b)(2), (c)(2)). The TLC would issue a summons for the alleged violation, and the seized vehicle would not be released until the administrative hearing, unless the owner or operator either (1) pleaded guilty to the Section 19-506(b)(1) violation and paid a fine or (2) posted a bond. *Calvo I*, 2017 WL 4231431, at *1 (citations omitted). In addition, the TLC required payment of the seized vehicle's towing and storage fees before it would release the vehicle; if the Section 19-506(b)(1) violation was ultimately dismissed, those fees would be returned. *Id.* (citations omitted).

The Court concluded that this practice was unconstitutional under the Fourth and Fourteenth Amendments as applied to vehicle owners with no prior violations in the preceding 36 months ("first-time violators"), and granted Plaintiffs' cross-motion for summary judgment as to liability relative to first-time violators. *Harrell I*, 138 F. Supp. 3d at 496. The Court reaffirmed its grant of summary judgment as to liability on reconsideration relative to Plaintiffs Michael Harrell, Jaclyn Restrepo, and Peter Camacho, but denied Plaintiffs' cross-motion for summary judgment as to liability relative to Plaintiffs Susan Calvo and John Peters Professional Limousines ("JPPL"). *Harrell v. City of N.Y.* ("*Harrell II*"), No. 14-CV-7246 (VEC), 2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015). In so holding, the Court found that there were questions of fact whether Plaintiffs Calvo and JPPL were actually first-time violators at the time of their complained-of seizures. *Id.* at *4.

Plaintiffs were granted leave to amend and added Eamon Yuel and Yong Zhang as plaintiffs. *Calvo I*, 2017 WL 4231431, at *2 (citation omitted). The parties proceeded through discovery before Plaintiffs moved for class certification. *Id*. The Court denied Plaintiffs' motion, concluding that they had "failed to propose a class that [was] defined in such a way that everyone within it [had] standing. . . . Under all of their proposed definitions, Plaintiffs [sought] to include all registered owners of vehicles that were seized by the City; Plaintiffs [ ] failed to rebut the City's compelling evidence that a subset of that class consists of 'straw' owners who did not suffer any injury in fact from the City's unconstitutional practice of seizing vehicles suspected of being used in violation of Section 19-506(b)(1) from first time violators." *Id*. at 7 (citations omitted). The Court granted Plaintiffs an opportunity to seek certification of a narrower class, hypothesizing that "[a] class consisting of registered owners who were either operating the vehicles at the time that they were seized or who retrieved the vehicles from the TLC might be sufficient to narrow the class to those who have Article III standing." *Id*. But the Court explicitly made "no finding relative to whether a class can be defined that would satisfy Article III and Rule 23, whether any of the named Plaintiffs would be a suitable class representative, nor whether Plaintiffs' counsel is qualified to be named as class counsel." *Id*.

Accepting the Court's invitation to try again, Plaintiffs moved for class certification, modifying somewhat the class definition that the Court had hypothesized might work from a standing perspective. *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Second Motion for Class Certification ("Pls.' Mem.") [Dkt. 225]. Defendants oppose Plaintiffs' motion on a number of grounds, in particular with regard to Article III standing and satisfaction of the certification requirements under Federal Rule of Civil Procedure 23. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Second Motion for Class Certification

("Opp.") [Dkt. 232]. For the reasons discussed below, the Court denies Plaintiffs' motion with prejudice.

## II. DISCUSSION

### A. The Court Will Assume Satisfaction of the Standing Requirement Although There Remain Questions Whether All Members of Plaintiffs' Proposed Class Would Have Article III Standing

Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)) (internal quotation marks omitted). "The filing of suit as a class action does not relax this jurisdictional requirement." *Id.* (citation omitted). To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Because these Article III requirements are "an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (internal quotation marks omitted); *see also In re Elec. Books Antitrust Litig.*, Nos. 11 MD 2293 (DLC), 12 Civ. 3394 (DLC), 2014 WL 1641699, at *8 (S.D.N.Y. Apr. 24, 2014) (citing *Lewis*, 518 U.S. at 358). Accordingly, a plaintiff's burden to show Article III standing becomes higher as the case proceeds. *See Lewis*, 518 U.S. at 358 (quoting *Lujan*, 504 U.S. at 561). Here, at class certification, Plaintiffs must prove standing by a preponderance of the evidence. *See Teamsters Local 445 Freight Div.*

*Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements . . . .").

In connection with class certification, "[t]he class must [] be defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d at 264. Although it is not necessary that each member of the putative class submit evidence of personal standing, "no class may be certified that contains members lacking Article III standing." *Id*. at 263–64. Put differently, "Article III's jurisdictional requirements [apply] to each member of a class." *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 126 (2d Cir. 2007) (citing *Denney*, 443 F.3d at 264), *rev'd on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Ultimately, the Article III standing inquiry must be examined through the prism of the class definition; in this Circuit, a class cannot be certified if any person captured within the class definition lacks Article III standing. *See Denney*, 443 F.3d at 263–64.[1]

The Second Circuit has made clear that in assessing Article III standing, "while ownership and possession generally may provide evidence of standing, it is the *injury* to the party seeking standing that remains the ultimate focus." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (emphasis added). Because of "the lack of proven injury," the Second Circuit has "denied standing to 'straw' owners who do indeed 'own' the property, but hold title to it for somebody else. Such owners do not themselves suffer an injury when the property is taken." *Id*. (citing *United States v. 500 Delaware Street*, 113 F.3d 310, 312 (2d Cir. 1997)). Thus, to demonstrate injury in fact sufficient for Article III standing, "one must be more

---

[1] Although other courts of appeals have adopted a test that "hinges exclusively on the Article III standing of the 'named plaintiffs' or 'class representatives'" and "ignore[s] the absent class members entirely," *In re Deepwater Horizon*, 739 F.3d 790, 800 (5th Cir. 2014) (discussing different circuit approaches to Article III standing inquiry at class certification), *Denney* quite clearly requires all class members to have standing.

than a mere 'straw owner[]' who holds title for some unknown person." *United States v. $829,422.42, Currency*, 561 F. App'x 100, 100 (2d Cir. 2014) (citation omitted). Rather, "[t]here must be some indicia of reliability or substance to claims of ownership in order to reduce the likelihood of a false or frivolous claim." *Id*. (citation and internal quotation marks omitted).

The Plaintiffs' new proposed class includes "all registered owners of straight plate vehicles[2] seized for alleged first-time violations of New York City Administrative Code Section 19-506 from September 8, 2011 to the present who were operating the vehicle at the time of the seizure, or who retrieved the vehicle personally or through an agent by paying towing and storage fees." Pls.' Mem. at 3–4. In other words, Plaintiffs propose that there be three requirements to be a class member: (1) the person[3] was the registered owner of the straight-plate vehicle; (2) the vehicle was seized for a first-time violation of the relevant provision on or after September 8, 2011; and (3) the person (a) was operating the vehicle at the time of the seizure, or (b) paid the required towing and storage fees *and* retrieved the vehicle either (i) personally or (ii) through an authorized agent.[4]

According to Plaintiffs, a registered owner's use of a vehicle at the time of its seizure proves that he or she was not a straw owner. Pls.' Mem. at 4. They also argue that paying towing and storage fees directly or through an agent shows a financial interest in the vehicle that

---

[2] A "straight plate" vehicle is a vehicle that is not registered as a "for hire" vehicle. *Harrell I*, 138 F. Supp. 3d at 485 n.3.

[3] The Court uses "person" to indicate either a human owner or a corporate owner.

[4] Plaintiffs insist that their proposed class definition makes it clear that there would need to be independent proof that the registered owner, if not the operator at the time of the seizure, paid for the recovery of the vehicle. Plaintiffs seem to argue that proof that the cost of retrieving the car came from the registered owner would demonstrate actual injury necessary for standing. Pls.' Mem. at 4–5. Plaintiffs do not explain how the class definition would work as to a registered owner who was not driving the vehicle at the time of seizure and was found not guilty of a violation so that payment of storage and towing fees were not required. Nor do they explain how, on a classwide basis, the Court would determine whether the funds necessary to pay the storage and towing fees actually originated with the registered owner, short of individualized fact finding associated with every single non-operator owner.

6

demonstrates true ownership. *Id*. at 5. Plaintiffs believe that, by adopting the definition of the class that the Court suggested might work, their definition resolves the concerns the Court had with their first proposed class definition by effectively "exclud[ing] any owner who elected not to recover their [sic] vehicle, as well as 'straw' owners who arguably suffered no cognizable injury," *id*. at 4, thus leaving in the class only individuals who have standing.

Plaintiffs' class definition raises problems of its own. Plaintiffs do not appear to account for registered owners who were operating the vehicle when seized (the "3(a)" group) but who abandoned the vehicle after the seizure—such individuals appear to fall *within* the class definition but nonetheless would appear to be "straw owners," as evidenced by their abandonment of the vehicle. Although not obvious by the bolded print definition of the class that appears in their brief, Plaintiffs assert that they intend to exclude from the class persons who might otherwise be included (*i.e*., registered owner, first-time seizure, operator at the time of seizure) if the vehicle is abandoned. Pls.' Mem. at 4; Reply at 2. And while that clarification helps to narrow the class, Plaintiffs nevertheless clearly intend to include in the class persons whose vehicles were recovered after a first violation but then abandoned after a subsequent seizure. Although Plaintiffs give Defendants' argument related to such putative class members short shrift, *see* Declaration of Andrew St. Laurent ("St. L. Decl.") [Dkt. 243] ¶ 29, the Court agrees with Defendants that an owner who retrieves a vehicle once but then abandons it a month or two later appears likely to be a straw owner. *See* Declaration of Edward Murray[5] ("Murray Decl.") [Dkt. 261] ¶¶ 43–45.

---

[5] Defendant was ordered to refile Murray's Declaration to include consistent pseudonyms for individuals and entities identified in the seizure records, but whose names were fully redacted in Murray's initial public filing. *See* Order, March 29, 2018 [Dkt. 260].

7

The Court's facial concerns aside, Defendants also raise a number of issues with Plaintiffs' definition and its effectiveness in defining a class that contains only persons with standing. *See* Opp. at 2–9. Through the declaration of Edward Murray, TLC's Assistant General Counsel, Defendants argue that the class as redefined would still contain individuals who lack standing.[6] *Id.* at 3–7; Murray Decl. In particular, the Murray Declaration analyzes the seizure records that would be used to identify prospective members of the class, finding a variety of fact patterns that raise very real concerns: individuals who "serially retrieved"[7] multiple vehicles that were registered to different individuals, who (sometimes) lived at the same address[8] (¶¶ 6–8; 14–21); registered owners who had multiple cars registered at different addresses at virtually the same time[9] (¶ 10); registered owners who were operating the vehicle at the time of seizure but had the vehicle retrieved by a "serial retriever"[10] (¶ 20); vehicles that were seized multiple times but registered to different owners, raising questions about the validity of the registrations[11] and

---

[6] Additionally, Defendants suggest that vehicle seizures that resulted from criminal violations of § 19-506 or were carried out for other reasons would complicate the use of the proposed class definition. *See* Opp. at 7–8. The Court believes that such circumstances would preclude an individual from joining the class (as the vehicle would not have been seized for a first-time violation) rather than undermine standing. The Court notes that Plaintiffs argue that a criminal violation of § 19-506 could not support a warrantless seizure, *see* Plaintiffs' Reply Memorandum in Support of Plaintiffs' Second Motion for Class Certification ("Reply") [Dkt. 241] at 4; because the Court assumes the class satisfies the standing requirements and denies the motion to certify on predominance grounds, it need not determine whether a seizure connected to a criminal violation of § 19-506 would be lawful.

[7] The Court uses "serial retriever" to refer to an individual, such as John Doe 62, who retrieved a number of different vehicles for which he was neither the registered owner nor operator at the time of seizure, which suggests to the Court that there was some sort of business arrangement associated with the serial retriever. *See* Murray Decl. ¶¶ 14–22.

[8] Nine putative owners used one out-of-state registration address in Philadelphia, PA, eleven used another, and six used a third Philadelphia address; none of these individuals operated the vehicle at the time of seizure. *See* Murray Decl. ¶¶ 6–8.

[9] John Doe 48 had vehicles registered at different Philadelphia, PA addresses simultaneously. *See* Murray Decl. ¶ 10.

[10] John Doe 62 retrieved the vehicle for putative owner John Doe 74, who was operating the vehicle at the time of the seizure. *See* Murray Decl. ¶ 20.

transfers[12] (¶¶ 23–27; ¶¶ 34–36); registered owners reclaimed vehicles after one seizure but then abandoned the vehicle after a subsequent seizure[13] (¶¶ 43–45); third-party authorizations to retrieve vehicles were used to allow a "serial retriever" to recover multiple vehicles, calling into question whether the registered owner was harmed by the seizure of the vehicle[14] (¶ 30); and corporate entities appear to have been used as alter-egos for individuals, making it difficult to ascertain the true owner of a vehicle and whether a violation was truly first-time[15] (¶¶ 46–51). Defendants also raised doubts as to the validity of registrations and third-party authorizations, noting through a proffered handwriting expert that signatures purportedly from the same registered owner did not match across the owner's documents. Opp. at 6 n.5; Declaration of Ruth Brayer ("Brayer Decl.") [Dkt. 235] ¶ 7.[16]

---

[11] Defendants also raise general concerns that registration documents may be insufficient to establish ownership, and that other documents, such as titles and leases, are needed to determine whether an individual had true ownership of the vehicle. Opp. at 8–9.

[12] Defendants cite cases of a single vehicle being seized on multiple occasions and registered under different names, including examples of vehicles with different registered owners or claimed by different retrievers all while the operator of the vehicle remained the same. See Murray Decl. ¶¶ 23–27; ¶¶ 34–36. For example, John Does 95, 97, and 99 appear to have transferred their vehicles to, respectively, John Does 96, 98, and 100 after each owner-operator's first seizure. Each vehicle was seized a second time, again operated by its original owner (e.g., John Does 95, 97, and 99). See Murray Decl. ¶ 35.

[13] Putative owners John Does 76 and 129—neither of whom operated their respective vehicles during the first or second seizure—each retrieved his vehicle after its first seizure but abandoned it after the second seizure. See Murray Decl. ¶ 44.

[14] John Doe 3 used the same authorization to claim a vehicle registered to John Doe 6 that was seized in February 2014 and again in March 2014. See Murray Decl. ¶ 30.

[15] On July 25, 2013, a vehicle registered to Company 3 and driven by John Doe 136 was seized. Approximately a year later, the same vehicle was again seized while being driven by John Doe 136, but by 2014 the vehicle was registered to John Doe 136 himself. Under Plaintiffs' class definition, both Company 3 *and* John Doe 136 would be class members, even though it is highly questionable that the subsequent seizure could be legitimately characterized as a "first-time" seizure. See Murray Decl. ¶ 47.

[16] Plaintiffs objected to the Court's consideration of Ms. Brayer's Declaration on a variety of grounds, including that handwriting analysis is not based on established science. See Letter, December 14, 2017 [Dkt. 238]. Established science or not, it does not require a handwriting expert to look at the signatures on the various documents highlighted in Ms. Brayer's Declaration and to conclude that there is serious reason to doubt that the signatures are all from the same person.

Plaintiffs largely answer Defendants' arguments through a declaration from their lawyer, Andrew St. Laurent. *See* St. L. Decl. While the Declaration properly notes that some of the issues that Murray identifies speak to membership in the class rather than to standing, the Declaration also dismisses some of the concerns as irrelevant without any argument. *See id*. For example, St. Laurent declares that "Murray notes that some registered owners abandoned vehicles after certain seizures but not after others. . . . However, there is no logical basis to find a registered owner forfeited his or her right to press claims arising from the seizure of a vehicle he or she spent time and money to recover based on a prior or subsequent abandonment of a vehicle. This argument is accordingly irrelevant." *Id*. ¶ 29. This argument misses—or purposefully avoids—the point entirely: the fact that a vehicle is abandoned by a registered owner who previously retrieved it (or had it retrieved) raises a significant question of fact as to whether he was a straw owner all along and therefore never had a cognizable injury associated with the seizure of the vehicle.

In all, although the Plaintiffs' class definition could have been more thoughtfully drafted (particularly as to the exclusion for abandonment), most of the issues Defendants raise speak only to whether a person would be able to opt-in to the class—such as whether the offense was truly first-time and whether a third-party authorization was valid—rather than to standing. Nonetheless, two issues suggest that some of the persons embraced by the proposed class definition may not have standing. First, the evidence of widespread registration fraud raises broad concerns about tying class membership, even partially, to being a registered owner. As Defendants suggest, other indicia of ownership, such as titles and leases, may be preferable and provide more certainty in proving vehicle ownership. Second, as discussed above, registered

owners whose vehicles were retrieved once but abandoned when they were subsequently seized may be straw owners who suffered no injury. As discussed in *Calvo I*,

> [A] 'straw' owner—one who does not have a true ownership interest in the vehicle but merely has the vehicle registered in his or her name—is not *injured* by signing an authorization for someone else to retrieve the vehicle from the TLC. Signing an authorization has no impact on such an owner because he or she has no true ownership interest in the vehicle that was seized; there is no evidence that such an owner cared at all or experienced any harm (emotional or financial) in connection with the vehicle being seized.

2017 WL 4231431, at *6. It is not inconceivable that a straw owner might assist with the recovery of a vehicle the first time it is seized but would not expend such effort for a subsequent seizure (not to mention the role that forged registrations and authorizations might play in such a recovery-then-abandonment scenario). Of course, a *true* owner could abandon a vehicle for an understandable purpose—perhaps the vehicle was beyond repair and thus not worth recovering.

Ultimately, even though it is unclear whether all members of the proposed class would have standing, because many of Defendants' concerns speak more to difficulties in proving class membership than standing, the Court will assume without deciding that, for the purposes of this Opinion, Plaintiffs' have defined a class, all members of which would have standing.

### B. Plaintiffs' Proposed Class Fails to Satisfy Rule 23

#### i. The Rule 23(a) Requirements

Rule 23(a) establishes the prerequisites to maintaining a suit as a class action. Pursuant to Rule 23(a), a class action may be certified only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

11

and (4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a).

Defendants have conceded numerosity.[17] While commonality[18] and typicality[19] appear easily satisfied despite Defendants arguments to the contrary, Defendants raise substantial concerns as to the adequacy of representation.

To find adequacy of representation, the Court must consider whether "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the [class representatives] and the members of the class; and (3) the [class

---

[17] Based on their review of Defendants' seizure records, Plaintiffs estimate that their class would include at least 5,000 individuals. *See* Pls.' Mem. at 11–12. Defendants concede numerosity as to the current definition proposed by Plaintiffs. Opp. at 10 n.10. The Court thus finds that the numerosity requirement is satisfied. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity requirement satisfied with class of at least 40 members) (citations omitted).

[18] Under Rule 23(a)(2), class members must have a "common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[E]ven a single common question will do." *Id.* at 359 (citation, internal quotation marks, and alteration omitted). This case raises, at a minimum, a common question as to the legality of the Defendants' vehicle seizures (which, in fact, has already been decided in *Harrell I*). Accordingly, the commonality requirement is satisfied.

[19] "To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citing *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir. 1993)) (internal quotation marks omitted). Where the "same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented," the typicality requirement is satisfied. *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) (citing *Robidoux*, 987 F.2d at 936–37) (internal quotation marks omitted).

Plaintiffs contend that the class representatives' claims are typical because, as with the commonality element, they arise from a uniform practice of unconstitutionally seizing vehicles, even though there are factual differences surrounding the circumstances of their seizures. Pls.' Mem. at 14. Defendants argue that the claims are not typical because the Court would have to conduct individualized examinations to decide whether each person was actually injured and his damages. Opp. at 10–12. They cite, out of context, a single case for the proposition that typicality cannot be satisfied if a court "must engage in a 'case-by-case evaluation of each encounter' in order to establish liability." *Id*. at 11 (quoting *Haus v. City of N.Y.*, 2011 U.S. Dist. LEXIS 155735, at *316 (S.D.N.Y. Aug. 31, 2011)). But in *Haus*, the court based its typicality determination on a finding that there was no uniform policy or practice to hold the plaintiffs' claims together. *Haus*, 2011 U.S. Dist. LEXIS 155735, at *317–20. Here, the Court has already determined that the Defendants engaged in an unconstitutional practice, and this same practice affected both the named Plaintiffs and the class sought to be represented. Defendants essentially misstate the legal standard for this element, and their arguments here relate to the standing issues discussed above and the predominance issues discussed below. Accordingly, the typicality requirement is satisfied.

representatives] ha[ve] a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Kux–Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 477 (S.D.N.Y. 2016) (quoting *Foley v. Transocean Ltd.,* 272 F.R.D. 126, 131 (S.D.N.Y.2011)). "A class representative is a fiduciary to the class and bears a responsibility to comply with discovery requests, . . . to possess a basic knowledge of the facts, . . . and to participate to some minimal degree in the lawsuit to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney." *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 76 (S.D.N.Y. 1999) (citations and internal quotation marks omitted). *See also Koss v. Wackenhut Corp.*, No. 03 CIV. 7679 (SCR), 2009 WL 928087, at *7 (S.D.N.Y. Mar. 30, 2009) ("A class representative is a fiduciary to the entire class and bears a responsibility to comply with discovery requests. . . . Class certification may be [] denied where the plaintiffs have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class.") (citations and internal quotation marks omitted). "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (citing *Kline v. Wolf,* 702 F.2d 400, 402–03 (2d Cir. 1983) (citation omitted)).

  Defendants challenge the adequacy of each of the named Plaintiffs, pointing to issues of unique defenses to and circumstances of their seizures, failures to comply with discovery requests, lack of familiarity with the Complaint, and questionable credibility as evidenced by deposition testimony. *See* Opp. at 12–20. Plaintiffs dispute and attempt to rebut these assertions, contending, *inter alia*, that the named Plaintiffs need not be perfect, that they are free of conflicts of interest, that they raised legitimate discovery objections while cooperating overall with discovery demands, and that they are sufficiently familiar with the case. *See* Reply at 5–9.

Defendants also challenge the adequacy of class counsel, alleging poor selection of plaintiffs, errors in the Complaint and briefs, obstruction of discovery, and class counsel's misrepresentation of their experience with class actions, which Defendants assert is actually quite limited. Opp. at 20–23. Plaintiffs dispute these contentions as well, claiming, *inter alia*, that the named Plaintiffs approached counsel and not *vice versa*, and that their attorneys' experience is genuine and sufficient. *See* Reply at 9–10.

Because the Court finds below that the proposed class fails to satisfy Rule 23(b)(3), the Court assumes without deciding that Rule 23(a) has been satisfied. The Court notes, however, that Defendants' arguments regarding the adequacy of the class representatives and class counsel are not wholly without merit and might have been a standalone basis to decline to certify the requested class.

### ii. The Proposed Class Fails to Satisfy Rule 23(b)(3) Because Individual Issues Predominate

In addition to satisfying Rule 23(a), a class action must fall within one of the types of class actions identified in Rule 23(b). *See* Fed. R. Civ. P. 23(b). Plaintiffs contend that certification of a class is appropriate under Rule 23(b)(3), which requires that "the court find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see* Pls.' Mem. at 17–22.

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)) (internal quotation marks omitted). Predominance "is satisfied 'if resolution of some of the legal

or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Id*. (quoting *Myers*, 624 F.3d at 547).

If individualized questions as to membership in the proposed class predominate over common questions, class certification is precluded. In *Mazzei*, the Second Circuit affirmed the district court's decertification of a class, noting that "without *class-wide* evidence that class members *were* in fact in privity with [the defendant], the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim." 829 F.3d at 272. "It was within the range of permissible decisions for the [district] court to determine that [the common] questions did not predominate over the individual questions of whether each class member was in a contractual relationship with defendants." *Id*. (citations and internal quotation marks omitted).

Similarly, in *Vogel v. City of New York*, the district court noted that if "too much individual inquiry is required to determine whether someone is a member of the class, then a court could find that class issues do not predominate over individual issues."[20] No. 14 CIV. 9171 (RMB), 2017 WL 4712791, at *5 (S.D.N.Y. Sept. 19, 2017) (citations and internal quotation marks omitted). The court went on to do just that, finding that because "potentially thousands of individualized and elaborate inquiries would be required to identify who is part of the class, . . . 'predominance' is not satisfied." *Id*. at *7.

As to superiority under Rule 23(b)(3), courts may consider:

---

[20] *See also Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14 CV 09764 KPF SN, 2018 WL 739580, at *14 (S.D.N.Y. Jan. 10, 2018) ("To be a member of the putative class . . . a current or former holder of a Certificate must show that it has retained the litigation rights associated with that Certificate. And without class-wide proof of litigation rights, 'the fact-finder would have to look at every class member's [transaction] documents to determine who did and who did not have a valid claim,' thereby defeating predominance.") (quoting *In re Petrobras Sec.*, 862 F.3d 250, 274 (2d Cir. 2017)).

15

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions; (B) the extent and
> nature of any litigation concerning the controversy already begun
> by or against class members; (C) the desirability or undesirability
> of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). In general, "Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (citation omitted). When "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of time, effort and expense, and promote uniformity of decision," the class action is a superior method of adjudicating disputes. *Id*. (citing Fed. R. Civ. P. 23 Advisory Committee's notes) (internal quotation marks omitted).

Defendants contend that, as in *Mazzei* and *Vogel*, individual issues involved in proving class membership will predominate over common class questions. They argue that the Court will have to examine each putative class member to ascertain whether he or she was actually injured by Defendants' unconstitutional policy, and whether there were other circumstances associated with the vehicle stop that otherwise justified the seizure. Opp. at 24–25. Defendants also note that damages calculations will require individualized examination. *Id*. at 25. In other words, certification will lead to "thousands of non-stop mini-trials . . . ." *Id*.

As to predominance, Plaintiffs' opening brief asserts that common questions predominate. Plaintiffs assert, *ipse dixit*, that "identification of class members is simple" through use of Defendants' seizure records and additional affidavits, and damage inquiries do not

16

overwhelm the common questions.[21]  *See* Pls.' Mem. at 17–21.  Plaintiffs made no effort to respond to Defendants' predominance arguments in their Reply.  *See generally* Reply.

The Court agrees with Defendants that individual questions predominate.  Proving membership in the class will be far from "simple," as illustrated by the unusual fact patterns discussed *supra* in Section II.A.  Defendants have presented persuasive evidence that the Court will have to wade through possibly fraudulent and forged documents to determine whether any given person in the seizure records, on which Plaintiffs intend to rely, truly belongs in the class.  For example, if the proposed class were certified, the Court would have to assess whether a person's purported first-time violation were truly his first, as there is evidence that some individuals were playing a shell game in which corporate forms and substance-less transfers of registration were used to hide true ownership of a vehicle.  *See supra* note 15.  The Court would have to assess the validity of third-party authorizations for any registered owner who authorized another person to retrieve his vehicle, as Defendants have presented credible evidence that some authorizations were forged.  The Court would have to assess individual bank records of registered owners who purportedly underwrote the cost of reclaiming the vehicle.  The Court would have to assess on a case-by-case basis whether a purported class member who retrieved his vehicle after his first violation but abandoned the vehicle after a subsequent violation is a true

---

[21]   Plaintiffs argue that administrative feasibility is not relevant to class certification.  Although courts previously required consideration of whether it was "administratively feasible for the court to determine whether a particular individual is a member," *Brecher v. Republic of Argentina*, 806 F.3d 22, 24–25 (2d Cir. 2015) (citation omitted), the Second Circuit later clarified that "a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23" and declined to adopt such a requirement.  *In re Petrobras Secs.*, 862 F.3d at 264.  It did so, however, in part by recognizing that an independent administrative feasibility requirement would "risk[] encroaching on territory belonging to the predominance requirement, such as classes that require highly individualized determinations of member eligibility."  *Id.* at 268 (citing *Mazzei*, 829 F.3d at 272).  In other words, the Second Circuit has recognized that administrative concerns regarding individual assessments of membership eligibility may be properly considered as part of a predominance analysis—rather than as a separate administrative feasibility assessment—and *not* that such concerns are irrelevant to class certification writ large.

owner or a straw owner of the vehicle. And the Court would also have to address any unique circumstances of a particular seizure that might remove an individual from the class, namely whether a vehicle was seized for purposes other than a first-time violation of § 19-506.[22]

In all, these inquiries would overwhelm the common question of law rooted in the unconstitutional seizure practice. Based on their assessment of the seizure records, Plaintiffs estimate that the class could include thousands of individuals, and evaluating whether each of those individuals actually belongs in the class would be highly fact-intensive for the Court, as well as the parties. The complexity of determining class membership in this case makes clear that individual questions predominate over the common questions in this case. Accordingly, Rule 23(b)(3) is not satisfied.

Because the Court finds that common questions do not predominate as required by Rule 23(b)(3), it denies Plaintiffs' motion for class certification, and does not reach the question of superiority under Rule 23(b)(3).[23] Although district courts have discretion to modify the definition of the proposed class, *see, e.g.*, *Sanchez v. N.Y. Kimchi Catering, Corp.,* No. 16 CIV. 7784 (LGS), 2017 WL 2799863, at *5 (S.D.N.Y. June 28, 2017) (citing *Robidoux*, 987 F.2d at 937), this Court declines to do so. Given the credible evidence of widespread fraud in the registration of vehicles that were seized for violations of §19-506, the Court believes there is no definable class that would satisfy Rule 23(b)(3).

---

[22] For example, named Plaintiff Yuel was issued a criminal summons pursuant to §19-506(b)(1), and, according to Defendants, his vehicle was or could have been seized as an instrumentality of that crime. *See* Opp. at 7, 18–19.

[23] Rule 23 also contains an implicit ascertainability requirement that, in the Second Circuit, "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 264. The Court also does not reach this issue.

18

### III. CONCLUSION

For the foregoing reasons, and because Plaintiffs have now twice failed to propose a class that can be certified, Plaintiffs' motion for class certification is DENIED with prejudice. The Clerk of Court is respectfully directed to terminate Docket Entry 224. The parties are directed to meet and confer and to propose a trial schedule to resolve the liability and damages issues as to Susan Calvo, John Peters Professional Limousines, Eamon Yuel, and Yong Zang, and to resolve the issue of damages as to Jaclyn Restrepo and Peter Camacho. The parties' proposed schedule must be filed on or before April 17, 2018.

**SO ORDERED.**

**Date: April 2, 2018**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**